UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF MISSISSIPPI

IN RE: SKUNA RIVER LUMBER, LLC                      CASE NO. 06-10114-DWH

OPINION

On consideration before the court is an application for compensation filed by Equity Partners, Inc., (EPI), related to services rendered in conducting an auction sale of certain assets owned by the debtor, Skuna River Lumber, LLC, (debtor); objections to said application having been filed by Borrego Springs Bank (Borrego), Silvaris Corporation (Silvaris), and State Bank and Trust Company (State Bank); and the court, having heard and considered same, hereby finds as follows, to-wit:

I.

The court has jurisdiction of the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157. This is a core proceeding as defined in 28 U.S.C. §157(b)(2)(A), (B), and (O).

II.

FACTUAL BACKGROUND

A.  The debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on January 26, 2006.

B.  An order was entered on April 14, 2006, granting the debtor's application to employ EPI to sell, lease, or otherwise dispose of the debtor's business as a going concern or to sell certain assets owned by the debtor. The following two

conditions, which were set forth in the order as indicated, are pertinent to the current proceeding, to-wit:

> a)  In the event of a successful credit bid by any of the Secured Creditors, or in the event of a foreclosure or other collection process by any of the Secured Creditors as a result of the lifting of the automatic stay as provided in the Order (A) Establishing Bidding Procedures in Connection with Solicitation of Offers for Sale of Substantially all Assets; (B) Approving Form, Manner, Scope and Substance of Notice Thereof, and (C) Establishing Time and Date of Sale Hearing and Objection Deadline (the "Bid Procedures Order"), EPI reserves the right to request a fee to which the Secured Creditors reserve their rights to object;
>
> d)  Any commission, fee and/or reimbursement of EPI on the Debtor's property sold and/or for the marketing costs advanced by EPI is reserved for later argument under applicable law, including 11 U.S.C. §506(c)....

C. The claims of the three creditors, who have objected to the EPI application, are described as follows:

1. <u>Borrego</u> - The debtor entered into a commercial loan transaction with Borrego on February 14, 2005, in the principal sum of $2,400,000.00. This indebtedness was secured by certain real property owned by the debtor, as well as, personal property described as "all equipment, fixtures, inventory, accounts, instruments, chattel paper, and general intangibles." The loan was guaranteed to the extent of $1,920,000.00 by the United States of America, Department of

Agriculture, as well as, the unlimited guaranties executed by Scott Clark and Company, Inc., and Ronald S. Clark. As set forth in Borrego's motions for relief from the automatic stay, the indebtedness, including accrued interest, escalated to $2,600,000.00.

Borrego has the largest claim in the debtor's bankruptcy case. Its claim is secured by practically all of the debtor's assets, but its lien position, as to some of the assets, is perhaps subject to the competing liens of other creditors, including Silvaris and State Bank. This is addressed in Adversary Proceeding No. 06-1088, styled State Bank and Trust Company v. Skuna River Lumber, LLC, Silvaris Corporation, Borrego Springs Bank, N.A., Ed Alexander, and Komatsu Financial.

Significantly, insofar as this compensation proceeding is concerned, Borrego filed two motions for relief from the automatic stay, the first on February 13, 2006, and the second on April 13, 2006. Both of these motions were <u>voluntarily withdrawn</u> by Borrego pursuant to orders entered respectively on March 20, 2006, and May 2, 2006.

2.  <u>Silvaris</u> - On June 14, 2005, the debtor executed a Secured Supplier and Exclusive Sales Agreement in favor of Silvaris, which is a wholesaler of industrial lumber and building products. Pursuant to this agreement and five modifications, executed thereafter, Silvaris advanced the debtor a total sum of $750,000.00. To secure these advances, the debtor executed a deed of trust on June 17, 2005, which encumbered the real property and improvements upon which the debtor's sawmill was located. On August 16, 2005, as additional security, the debtor

executed a security agreement which granted Silvaris a lien on all inventory, accounts, and equipment then owned or thereafter acquired by the debtor. As of the bankruptcy petition date, Silvaris asserted that it was owed the sum of $744,681.89, plus interest and attorney's fees.

On January 31, 2006, Silvaris filed a motion for relief from the automatic stay which, following one continuance, was heard by the court on March 10, 2006. Because Silvaris appeared to be grossly undersecured, considering the claim of Borrego, the court preliminarily overruled this motion without prejudice through an order entered on March 24, 2006. A final order denying the motion was thereafter entered on April 17, 2006.

3. State Bank - According to its proof of claim, as of March 7, 2006, the debtor owed State Bank the total sum of $579,166.87, which represents a principal balance of $531,070.01, accrued interest of $25,887.20, and late fees of $22,209.66. This claim was collateralized by several security agreements which encumbered the debtor's accounts, inventory, and equipment. There was no lien on the realty or fixtures. The claim was also secured by the guaranties of non-debtors, as well as, their assets. An agreed order was entered by the court on April 24, 2006, approving a consent motion for relief from the automatic stay which allowed State Bank to pursue collection activities against the non-debtor guarantors.

    As noted hereinabove, State Bank does have certain competing lien interests with Borrego which will be resolved through Adversary Proceeding No. 06-1088.

D. On December 9, 2005, the debtor terminated its sawmill operations and has been unable to resume these operations since that date.

E. In the subject application for compensation, EPI is seeking the reimbursement of expenses that it advanced in the sum of $13,901.04, plus a commission for its services in the sum of $15,000.00. This is consistent with the agreement that EPI executed with the debtor, wherein EPI agreed that the expenses would be capped at $18,000.00, and that its commission would be capped in the sum of $15,000.00 if the highest price received at the sale was the result of a "credit bid."

    In preparation for the auction sale, EPI performed the following services:

1. 2000 notices of the sale were mailed to prospective bidders.

2. 300 personal telephone calls were placed.

3. Press releases were issued in trade journals.

4. The sale was advertised in the *Wall Street Journal*.

5. On site opportunities were provided for the prospective bidders to inspect the various assets.

6. Thirty-four prospective bidders were generated.

    EPI lotted the assets for sale and conducted the auction in open court on June 15, 2006.

Prior to the actual sale, the following "stalking horse" bids were obtained and noticed to all of the prospective bidders:

Lot 1 (8.3 acres "carve out" realty): Weyerhaeuser Co. - $62, 250.00

Lot 2 (Machinery and equipment): Perfection Machinery - $265,000.00

Lot 3 (All real property): No "stalking horse" bid

Lot 4 (All realty, machinery and equipment): SB Capital - $530,000.00

The final bid of each bidder at the sale by lot categories is set forth as follows:

Lot 1 (8.3 acres "carve out" realty): Weyerhaeuser Co. - $62,250.00

Lot 2 (Machinery and equipment):

    SB Capital - $575,000.00

    Perfection Machinery - $565,000.00

    Koster Industries - $515,000.00

    Michael Fox International - $340,000.00

Lot 3 (All realty): no bids

Lot 4 (All realty, machinery and equipment):

    Borrego (credit bid) - $705,000.00

    Perfection Machinery - $695,000.00

The sale produced positive results. In Lot 2, the machinery and inventory category, the final bid of $575,000.00 exceeded the "stalking horse" bid of $265,000.00 by $310,000.00. In Lot 4, the "all assets" category, Borrego's credit bid of $705,000.00

exceeded the "stalking horse" bid of $530,000.00 by $175,000.00. The cash bid of Perfection Machinery was only $10,000.00 less.

Silvaris, State Bank, and The Sommerville Companies, Inc., a creditor who also filed an objection to the auction proceeding, were present at the sale, but they elected not to participate in the bidding process. Borrego did not participate until the bidding on Lot 4 had begun. When Borrego entered the process with its credit bids, the interest of the other bidders in the auction was effectively "chilled," primarily because of the sheer size of Borrego's claim compared to the value of the assets being auctioned.

The objectors assert that the services of EPI were ineffective. For the reasons set forth herein, the court disagrees with this assessment.

III.

DISCUSSION

Since there are no unencumbered assets in the debtor's bankruptcy estate, EPI seeks to recover the expenses that it advanced plus its commission by surcharging the creditors' collateral pursuant to §506(c) of the Bankruptcy Code. The Fifth Circuit Court of Appeals addressed this issue in a case styled *In the Matter of Delta Towers, LTD*, 924 F.2d 74 (5th Cir. 1991). The Court's language is instructive, to-wit:

> Generally, administrative expenses, such as the utility fees here, are satisfied out of the bankruptcy estate. *In re Trim-X, Inc.*, 695 F.2d 296, 301 (7th Cir. 1982). The Bankruptcy Code furnishes an exception to the general rule in §506(c), which provides that a "trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." In order to charge a secured creditor with administrative expenses under §506(c), three elements must be shown: (1) the expenditure was necessary, (2) the amounts expended were reasonable, and (3) the creditor benefitted from the expenses. *In re Trim-X, Inc.*, 695 F.2d at 299. The burden of

demonstrating these elements is on the party seeking recovery. *See In re Flagstaff Foodservice Corp.*, 739 F.2d 73, 77 (2d Cir. 1984) (*"Flagstaff I"*); *Brookfield Production Credit Ass'n v. Borron,* 738 F.2d 951, 952 (8th Cir. 1984).

...Courts have construed the benefit element as requiring that the claimant incur the expenses primarily for the benefit of the secured creditor and that the expenses resulted in a quantifiable direct benefit to the secured creditor. *In re Cascade Hydraulics & Utility Service, Inc.*, 815 F.2d 546, 548 (9th Cir. 1987); *Brookfield Production,* 738 F.2d at 952; *In re Beker Industries Corp.*, 89 B.R. 336, 342 (S.D.N.Y. 1988). Indirect or speculative benefits are insufficient. *In re Flagstaff Foodservice Corp,* 762 F.2d 10, 12 (2d Cir. 1985) (*"Flagstaff II"*). At the same time, expenses which benefit the debtor or other creditors rather than the secured creditor himself are immaterial. *Flagstaff I,* 739 F.2d at 76.

*Delta Towers,* 924 F.2d at 76-77.

The bankruptcy court in *In re Hughes,* 2006 WL 1308677 (Bankr. S.D. Fla. 2006), reached a similar conclusion, to-wit:

The term "surcharge" is not defined or contained within Title 11. However, it is a term commonly used when a trustee or creditor seeks to invoke 11 U.S.C. §506(c) in order to be compensated or reimbursed by a secured creditor, either directly, or "indirectly" out of the proceeds generated from the sale of the secured creditor's collateral. Section 506(c) provides:
The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

However, "[s]urcharging collateral subject to a security interest is the exception and not the rule for recovering costs and expenses associated with the preservation or disposition of estate property. Ordinarily, the costs and expenses detailed in Section 506(c) are paid from the unencumbered assets of a bankruptcy estate rather than from secured collateral." *In re Smith International Enterprises, Inc.*, 325 B.R. 450, 453 (Bankr. M.D. Fla. 2005). Generally, administrative expenses in bankruptcy cases are charged to the estate and not to the assets or equity belonging to secured creditors. *In re Trim-X, Inc.*, 695 F.2d 296, 301 (7th Cir. 1982). To justify the imposition of costs against a secured creditor, three elements must be established by the trustee: (1) the purpose for the costs and expenses is necessary to preserve or dispose of the creditor's collateral; (2) the costs and expenses are reasonable as measured against the amount of costs and expenses that would have been incurred by the holder of a secured claim in the property; and (3) the extent of any direct benefit to the holder of the secured claim. *In re Summit Ventures, Inc.*, 135 B.R. 478, 482 (Bankr. D. Vt. 1991); *Accord, General Electric Credit Corp. vs. Peltz,* 762 F.2d 10, 12

(2d Cir. 1985). "We allow payment of administrative expenses from the proceeds of secured collateral when incurred primarily for the benefit of the secured creditor or when the secured creditor caused or consented to the expense." *In re Compton Impressions, Ltd.*, 217 F.3d 1260 (9th Cir. 2000), *citing In re Cascade Hydraulics & Utility Serv., Inc.*, 815 F.2d 546, 548 (9th Cir. 1987).

*Id.* at 2.

A case cited by Borrego, *In re Pink Cadillac Associates*, 1997 WL 164282 (S.D.N.Y. 1997), 37 Collier Bankr. Cas. 2d 1213, is distinguishable from the matter before this court. In *Pink Cadillac*, the Chapter 11 trustee sold a commercial building which was encumbered by a mortgage. At the auction sale, the sole bid was tendered by the mortgagee in the form of a credit bid pursuant to §363(k) of the Bankruptcy Code. Thereafter, the trustee submitted his request for compensation pursuant to §§326(a), 330, and 506(c). The United States Trustee objected because the compensation requested exceeded the maximum amount allowable under §326(a), which limits a trustee's compensation to no more than a specific percentage of "all monies disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims." The trustee contended that his request was well below the amount allowable under §326(a) if the calculation of the monies disbursed included the amount of the credit bid. Ironically, the trustee's request was acceptable to the mortgagee. The district court disallowed the trustee's request pursuant to §326(a), concluding that the bankruptcy court should not have included the amount of the credit bid as "monies disbursed" in calculating the compensation.

The district court also disallowed the trustee's request under §506(c), concluding that this statute did not give the trustee the right to seek compensation directly from the secured creditor. In the opinion of this court, and apparently that of the Fifth Circuit Court of Appeals, as

evidenced by the language in the *Delta Towers, Ltd.* decision, cited hereinabove, the district court in *Pink Cadillac* simply misconstrued §506(c). When there are otherwise no available funds in the estate, §506(c) specifically provides that a "trustee may recover from property securing an allowed secured claim..." provided the trustee can show that the relevant expenses were necessary and reasonable, as well as, that they provided an actual benefit to the creditor. This is consistent with the *Hughes* decision rendered in the Southern District of Florida.

Despite its §326(a) and §506(c) conclusions, the district court in *Pink Cadillac* remanded the proceeding to the bankruptcy court for further proceedings including, if appropriate, consideration of the compensation in quantum meruit. Quantum meruit is certainly a theory that could well be applicable to the services provided in this proceeding by EPI.

IV.

In the opinion of the court, EPI's efforts were exceptional in stimulating interest. From the *Wallstreet Journal* notice, the trade journal press releases, the 2000 mailed notices, and the 300 personal telephone calls, 34 prospective bidders actually expressed an interest in purchasing the debtor's sawmill assets. Five non-credit or cash bidders actually appeared in open court and participated in the auction sale. This number was lower than the 34 total prospects generated because the minimum "stalking horse" bids had already been disclosed several days before the sale to all of the potential participants.

None of the objectors seriously challenged the necessity or the reasonableness of EPI's charges. The expenses advanced by EPI were well documented, and its commission of $15,000.00, which was contractually limited because of Borrego's successful credit bid, amounted to just over two percent (2%) of this bid. As such, the only question that remains is

whether the creditors holding liens on the assets, Borrego, State Bank, and perhaps Silvaris, actually benefitted from EPI's services.

Initially, there was anticipation that the debtor's business could be sold as a going concern which would have certainly benefitted all of the creditors. This, of course, did not happen. Borrego successfully acquired the realty, as well as, the machinery and equipment for the credit bid price of $705,000.00.

Excepting the "non-carve out" realty, the sale established a market value for the 8.3 acres of real property, as well as, all of the machinery and equipment. Deficiency claims have been established for both accounting and tax purposes obviating the need for updated appraisals and the expenses attendant thereto.

The court will now, in the aforementioned adversary proceeding, determine for the parties the application of the lien claims to the credit bid proceeds. There is no longer a need for any of these parties to be concerned about filing motions to seek relief from the automatic stay. There will also be no need for the foreclosure sales of the real properties or the disposition of the machinery and equipment through commercially reasonable procedures.

Had the competing creditors fought over and obtained their separate items of collateral, there would have been separate motions for relief from the automatic stay in addition to the subsequent dispositions of the collateral pursuant to state law. Not having to undertake these processes and being able to avoid the legal fees and costs that would have necessarily been required in connection therewith, is a direct and non-speculative benefit to these creditors.

The court would reiterate that Borrego, which obviously would bear the largest part of EPI's charges, filed two motions for relief from the automatic stay, but withdrew these motions

to allow the auction process to be consummated. Ironically, Borrego initially complained that the auction process would take too long, but, at the most recent hearing on EPI's application, complained that the auction time line was too abbreviated.

Without question, Borrego and the other secured creditors had the absolute right to credit bid. Credit bids are permitted by law and they were specifically contemplated by the orders entered earlier in this case. Borrego exercised its option and actively participated by offering three incremental bids on Lot 4. Borrego's bids caused Perfection Machinery to elevate its bids from its initial offer of $640,000.00, to its final offer of $695,000.00. Because Borrego directly involved itself in the bidding process and because it elected to withdraw its motions for relief <u>to allow the auction sale to test the market</u>, the court is of the opinion that Borrego is equitably estopped from objecting to EPI's compensation. Borrego waived its right to object by its own overt actions.

Borrego argues that since the assets were acquired through its successful credit bid, that there is no way that it could have received any actual benefit from the auction sale. To the contrary, the court has quantified hereinabove the benefits to Borrego, as well as, to Silvaris and State Bank. However, in addition to the actual benefits, the court would hasten to point out that to disallow reimbursement of expenses and compensation to EPI would significantly discourage professionals such as EPI from attempting to assist debtors and trustees in efforts to market assets if a credit bid could negate the prospects of being compensated. Considering the operative facts in this proceeding, a decision denying EPI's application would send a very negative message to the professionals who effectively participate in and provide valuable assistance to the reorganization process. It would send the same message to secured creditors who frequently rely

on these same services in order to gain an enhanced return on assets sold through a bankruptcy sale as opposed to a foreclosure sale on the "courthouse steps."

This court is of the opinion that EPI performed admirably. It did, in a cost effective and reasonable manner, exactly what it was employed to do. The auction sale assisted in the administration of this bankruptcy estate and provided actual benefits to the secured creditors who held liens on the assets sold. The court will approve the application as submitted by EPI for both the reimbursement of expenses that it advanced in the sum of $13,901.04, as well as, its commission in the sum of $15,000.00. Further, the court is of the opinion that the assets of this estate should be surcharged pursuant to §506(c) of the Bankruptcy Code to insure that EPI is indeed paid. A judicial lien, superior to the existing liens of creditors holding claims against these assets, will be impressed by the court against these assets accordingly.

A separate order and judgment will be entered consistent with this opinion.

This the 22nd day of September, 2006.

/s/ David W. Houston, III
DAVID W. HOUSTON, III
UNITED STATES BANKRUPTCY JUDGE